IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SUE WHITE,

    Plaintiff,

v.

MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,

    Defendant.

No. C 06-01640 JSW

**ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Plaintiff Sue White's ("White") Motion for Remand and the Commission of the Social Security Administration's ("Commissioner") Cross-Motion for Summary Judgment. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the administrative record and considered the parties' papers and the relevant legal authority, and good cause appearing, the Court hereby GRANTS White's Motion to Remand and DENIES Commissioner's Cross-Motion for Summary Judgment

**BACKGROUND**

White brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner denying her request for Social Security disability benefits. White, a 59 year old female, injured her knee at work in 1991. (Certified Transcript of Record Proceedings ("Tr.") at 22.) As a result, she had three arthroscopic surgeries between 1992 and 1999. (*Id.*) White applied for disability benefits in 1999, but the Administrative Law

Judge ("ALJ") ultimately denied the application in 2001. (*Id.* at 31-35.) After the Appeals Council declined to review the ALJ's decision, White did not seek judicial review and instead returned to work during 2001 and 2002. (*Id.* at 413-14.)

Citing increased knee pain and instability, as well as new complaints of thumb pain and possible carpal tunnel syndrome, White quit her job as a law office manager on October 25, 2002. (*Id.* at 23.) She filed a second disability benefit application on September 26, 2003 for the period between her departure date and the date her Social Security insured status expired, December 31, 2002. (*Id.* at 20.) Though *res judicata* usually applies to repeat applications, here the ALJ found that new and material evidence of thumb impairment amounted to a change in circumstances that rebutted any *res judicata* effect. (*Id.* at 22.)

Drs. Reynolds and Goldman have been treating White for her continuing knee problems, since 1992 and 1999, respectively, culminating in a total knee replacement in August 2003. (*Id.* at 310, 337, 355.) However, neither doctor ever commented on her ability to work with her current impairments. Instead, the ALJ considered medical evaluations conducted by three different examining physicians from 2001 to 2003: Dr. William Talmage, Dr. Bryan Barber, and Dr. Lynn Shafer. (*Id.* at 213, 233, 254.) Dr. Talmage examined White's knee and reviewed her medical records on September 6, 2001. (*Id.* at 213.) In his opinion, White's treatment had been correct and her condition was "stable for the foreseeable future." (*Id.* at 228.) He felt White was "capable of work of a semi-sedentary nature," citing her personal expression that she frequently needed to "get up and walk around." (*Id.* at 229.)

Dr. Barber examined White on January 6, 2003, just after her last insured date. (*Id.* at 233.) He found knee pain when he palpated the medial joint line and when he performed the McMurray's test. (*Id.* at 238.) He also cited objective evidence from her magnetic resonance imaging ("MRI") conducted in 1999, which showed "25% loss of medial compartment joint space and an osteochondral defect in the tibial plateau." (*Id.*) Dr. Barber diagnosed White with "increasing degenerative arthritis medial compartment left knee" and recommended limiting her to sedentary work "with the option of sitting or standing as symptoms dictate" ("sit/stand option"). (*Id.*) In her hands, he found "visible enlargement of the thumb metacarpal-carpal

joints bilaterally and a palpable ganglion on top of her left nondominant thumb metacarpal-carpal joint." (Tr. at 240.) Noting White's subjective complaints of intermittent slight to moderate thumb pain, Dr. Barber believed she was "on the doorsteps of surgical intervention." (*Id.*)

A few months later, on August 5, 2003, Dr. Shafer examined White's thumbs, but not her knee. (*Id.* at 254.) She diagnosed White with "bilateral carpal metacarpal osteoarthritis of both hands" but found no evidence of carpal tunnel syndrome or any cysts. (*Id.* at 259-60.) Dr. Shafer recommended many conservative treatments but did not feel surgery was as imminent as Dr. Barber had believed. (*Id.* at 260.) Dr. Shafer indicated that limiting White to lifting 20 pounds intermittently, 40 pounds occasionally, and using the keyboard 25-30% of the workday would be a sufficient work restriction. (*Id.* at 261.)

However, Dr. Shafer noted White actually left her job for interpersonal reasons, and had not notified her employer of any medical issues regarding her thumbs. (*Id.*) Dr. Shafer stated that White "did not seem eager to seek medical care, inasmuch as it has been over nine months since her termination and claimed knowledge of date of injury" and "she had recommendations of treatment from Dr. Barber back in 1/03 . . . on which [she] has not acted." (*Id.* at 260.) Dr. Shafer disagreed with Dr. Barber about the severity of White's thumb impairment, stating "should her symptoms truly have been as invasive as she describes, that at least some follow-up would have been pursued under rational circumstances." (*Id.* at 262.) (emphasis in original)

After conducting an administrative hearing, the ALJ found that White had not engaged in substantial gainful activity since October 25, 2002. (*Id.* at 25.) He further found that her medical problems constituted "severe impairments which significantly limited her ability to perform basic work activities." (*Id.* at 26.) However, the ALJ found White's impairments did not satisfy any of the criteria outlined in the Listing of Impairments set forth in 20 C.F.R., Part 404, Subpart P, Appendix 1. (*Id.*) Proceeding to step four of the sequential evaluation process, the ALJ rejected Dr. Barber's sit/stand option in compiling White's residual functional capacity. (*Id.* at 25.) The ALJ concluded White was capable of doing a reduced range of sedentary work,

and therefore was not "disabled" within the meaning of the Social Security Act because she could perform her past relevant work. (Tr. at 26.)

White filed a request for review of the ALJ's decision, which the Appeals Council denied. (*Id.* at 6.) Having exhausted her administrative remedies, White commenced this action for judicial review of the ALJ's decision.

## ANALYSIS

**A.     Standard of Review of Commissioner's Decision to Deny Social Security Benefits.**

A federal district court may not disturb the Commissioner's final decision unless it is based on legal error or the findings of fact are not supported by substantial evidence. 42 U.S.C. § 405(g); *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). "Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). To determine whether substantial evidence exists, courts must look at the record as a whole, considering both evidence that supports and undermines the ALJ's findings. *Reddick*, 157 F.3d at 720. The ALJ's decision must be upheld, however, if the evidence is susceptible to more than one reasonable interpretation. *Id*. at 720-21.

**B.     Legal Standard for Establishing A Prima Facie Case for Disability.**

The plaintiff has the burden of establishing a prima facie case for disability. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). The ALJ follows a five-step process in determining whether the claimant is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *see* 20 C.F.R. § 404.1520. First, the claimant must not be engaging in substantial gainful activity. 20 C.F.R. 416.920(b). Second, the claimant must have a severe impairment. 20 C.F.R. § 416.920(c). Third, if the claimant's impairment meets or equals one of the impairments listed in Appendix 1 to the regulation (a list of impairments presumed severe enough to preclude work), claimant will be found disabled without consideration of age, education, or work experience. 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner will assess and make a finding

about the claimant's residual functional capacity ("RFC") based on all relevant medical and other evidence in the claimant's case record. 20 C.F.R. § 416.920(e). If the claimant can still perform her past relevant work, she will not be found disabled, otherwise the ALJ will go to step five. 20 C.F.R. § 416.920(f). In the fifth step, if the claimant's impairments prevents her from making an adjustment to any other work in the national economy, she will be found disabled. 20 C.F.R. § 404.1520(g). The claimant has the burden of proof at steps one through four; the burden shifts to the ALJ at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

Here, the ALJ determined that White was not disabled because (1) she did not have any of the related clinical findings so as to meet or equal the level of severity of any of the listings in Appendix 1, Subpart P, Regulations No. 4; and (2) she was capable of performing her past relevant work as an administrative secretary. (Tr. at 25.)

**C. Substantial Evidence in the Record Supports the ALJ's Conclusion Regarding White's Upper Extremity Impairment and Episodes of Instability.**

**1. The ALJ properly considered White's upper extremity impairment.**

White argues the ALJ incorrectly found her not disabled because he improperly excluded her thumb condition from her RFC and did not call a medical advisor to determine the onset date of this upper extremity impairment. (Mot. at 8, 9.) The RFC, used in step four of the sequential evaluation, measures "the most [claimant] can do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). When compiling a claimant's RFC, the ALJ must consider all relevant evidence in the record. *Id.* The ALJ will consider "any statements about what [claimant] can still do that have been provided by medical sources." 20 C.F.R. § 416.945(a)(3).

White misinterprets the ALJ's decision. The ALJ did properly consider White's upper extremity impairment in his findings. First, he deemed White's thumb impairment both severe and sufficiently "new and material" to overcome res judicata from her prior application. (Tr. at 24.) Second, a close reading of the hearing transcript reveals that the ALJ included restrictions pertaining to White's thumbs in his RFC findings. The initial hypothetical posed by the ALJ to the vocational expert did not include any weightlifting restrictions. (*Id.* at 427-28.) However,

when White's attorney asked for another hypothetical including Dr. Barber's opinion of her thumb impairment, the ALJ introduced a weightlifting restriction of five to ten pounds. (*Id*. at 431-32.) In his final RFC, the ALJ concludes that White is limited to lifting between five and ten pounds. (*Id*.) Thus, it is clear that the ALJ took White's thumb impairment into account.

To the extent White argues that the ALJ improperly concluded her thumb impairment was not disabling despite Dr. Barber's report, the ALJ's conclusion was supported by substantial evidence. The ALJ may reject the opinion of an examining physician, such as Dr. Barber, who is contradicted by another physician, if the ALJ provides specific and legitimate reasons supported by substantial evidence in the record. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Dr. Barber indicated White's thumb injuries were serious, verging on the need for surgery, but did not give any specific work restrictions beyond precluding her from "forceful gripping/grasping and heavy lifting." (Tr. at 240.) Dr. Shafer stated specific weight and typing time restrictions of "20 pounds intermittently and 40 pounds occasionally" and "25-30% of her workday" on the keyboard, absent her knee problems. (*Id.* at 260.) However, she noted that White "did not seem eager to seek medical care" for her thumb injuries because she had not yet acted on Dr. Barber's recommendations for treatment given to her nine months prior. (*Id*.) Dr. Shafer further noted that White left her employment "for non-medical reasons." (*Id*. at 261.)

Moreover, the ALJ is "entitled to draw an inference from the general lack of medical care," especially where claimant seeks treatment for other medical issues. *Flaten v. Sec'y of Health and Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995). Here, the ALJ noted that White failed to pursue any treatment for her thumb pain and never mentioned the pain to her employer. (Tr. at 24.) The ALJ listed this failure to seek treatment, along with Dr. Shafer's less severe diagnosis and notation that White actually left work because of interpersonal conflicts, among his reasons for discounting the severity of her functional limitations. (Tr. at 24.) Because the ALJ provided specific and legitimate reasons based on substantial evidence in the record to support his conclusions, to the extent the ALJ concluded White's thumb impairment was not disabling despite Dr. Barber's report, the ALJ did not err.

Finally, White contends the ALJ improperly discounted Dr. Barber's report because Dr. Barber wrote it after her insured date expiration. Therefore, she argues, the ALJ erred by not consulting a medical advisor to determine whether the onset of her impairment could have occurred prior to her insured date expiration. However, the ALJ adhered to the rule that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition." *Lester*, 81 F.3d at 832 (citing *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)). There is no evidence in the record indicating that the ALJ ignored Dr. Barber's opinion because it was completed after White's insurance had expired. Nor did the ALJ dispute that it was acceptable to use Dr. Barber's report to establish disability during her insured period. Indeed, the ALJ credited most of Dr. Barber's post-expiration evaluation when making his findings. (Tr. at 25.) Moreover, because the ALJ concluded that White was not disabled, he was under no obligation to consult a medical advisor to determine whether the onset of her impairment could have occurred prior to the expiration of her insured date. *See Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir. 1996) ("holding that "[b]ecause the ALJ found that [the plaintiff] ... was not disabled, the judge needed no medical expert to determine the onset date of the alleged disability"). Accordingly, the ALJ's consideration of White's thumb impairment was supported by substantial evidence in the record.

**2. The ALJ properly excluded White's knee instability claims from her RFC.**

White also argues that the ALJ erred by excluding her episodes of knee instability from her final RFC. (Mot. at 11.) When the ALJ assesses the RFC, "claimant's credibility becomes important . . . ." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001). To make a credibility determination, the ALJ can use "'ordinary techniques of credibility evaluation,' such as considering the claimant's reputation for truthfulness and any inconsistent statements in her testimony." *Id.* at 1148. The ALJ may reject claimant's testimony, but only if he provides "specific, convincing reasons for rejecting the claimant's subjective statements." *Id.* (citing *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989)). In *Tonapetyan*, the ALJ cited claimant's inconsistent statements as one reason for rejecting her disability claim. *Id.*

7

Additionally, the ALJ may consider "claimant's daily activities, [her] work record, and testimony from physicians . . . concerning the nature, severity, and effect" of her injuries. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). The *Thomas* court held the ALJ had provided clear and convincing reasons for rejecting claimant's testimony. *Id.* at 959. Examples of sufficient reasons were that there was "no objective medical evidence" to support claimant's limitations and because claimant "had not been a reliable historian." *Id.*

Here, the ALJ cited the fact that White initially stated she had episodes of falling down, but when further questioned she clarified that she never actually fell all the way to the ground. (Tr. at 24.) Moreover, the ALJ found that there were no medical records relating to her reported falls. (*Id.*) Indeed, the only mention of any instability was Dr. Barber's notation that, according to White, her "knee swells and buckles but has not dropped [her] all the way to the ground." (*Id.* at 235.) No doctor had witnessed this phenomenon or found any objective causative factors. Also, the ALJ again noted the conflicting explanations for why White left her job. (*Id.* at 24 These reasons are sufficient substantial evidence to call her credibility partly into question and to discount her testimony.

Finally, White argues the ALJ should have given more weight to the vocational expert's opinion that she would be disabled if knee instability was included in her RFC. In step four of the sequential process for determining whether claimant is disabled, the ALJ "may use the services of vocational experts . . . to help [] determine whether [claimant] can do [her] past relevant work given [her] residual functional capacity." 20 C.F.R. § 416.960. A hypothetical question to the vocational expert must "set out *all* the limitations and restrictions of the particular claimant." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1993) (emphasis in original). However, a vocational expert's testimony "is valuable only to the extent that it is supported by medical evidence" and "has no evidentiary value if the assumptions in the hypothetical are not supported by the record." *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989). Moreover, "the ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel. . . . Rather, the ALJ is 'free to accept

1 or reject these restrictions . . . as long as they are supported by substantial evidence.'"
2 *Magallanes*, 881 F.2d at 756-57.

3 Here, White contends the ALJ posed an incomplete hypothetical to the vocational
4 expert. She points out that when her counsel posed a hypothetical containing the instability
5 issue, the vocational expert testified it would limit her ability to work. However, considering
6 the lack of medical evidence and that White may actually have left work for "interpersonal"
7 reasons, the ALJ determined her claimed limitations with respect to knee instability were not
8 supported by the record. Moreover, White's counsel had difficulty quantifying how the
9 problem actually manifested itself in the workplace when he posed the hypothetical to the
10 vocational expert. (*Id*. at 429-31.) Thus, the ALJ's decision not to rely on White's attorney's
11 hypothetical and the resulting testimony by the vocational expert was supported by substantial
12 evidence.

### D. The ALJ Improperly Rejected Dr. Barber's Sit/Stand Option Recommendation.

14 Finally, White contends the ALJ improperly rejected Dr. Barber's recommendation for a
15 sit/stand option, which was not contradicted by any other physician. The ALJ may not reject
16 the uncontroverted opinion of an examining physician without giving specific and legitimate
17 reasons that are clear and convincing. *Andrews*, 53 F.3d at 1041.

18 The ALJ gave specific reasons for rejecting Dr. Barber's sit/stand option, namely
19 because "(1) Dr. Barber does not explain how standing would relieve knee pain or stiffness; (2)
20 he does not explain why normal breaks and simply stretching the left leg would not suffice to
21 relieve pain or stiffness; (3) no other evidence suggests the need for a sit/stand option; and (4)
22 claimant's own testimony focused on the need to *avoid* standing and walking." (Tr. at 25.)

23 The ALJ's first two reasons essentially state that Dr. Barber did not properly explain
24 himself, and consequently, the ALJ concluded Dr. Barber was wrong. However, "the ALJ must
25 do more than offer his conclusions. He must set forth his own interpretations and explain why
26 they, rather than the doctors', are correct." *Embrey,* 849 F.2d at 421-22. In *Embrey,* the ALJ
27 rejected claimant's disability claim despite conditions listed on his application such as
28 "herniated disc and acute lumbosacral strain, heart disease . . . and diabetes mellitus." *Id.* at

9

420. Among many symptoms, claimant testified to being bedridden once or twice a week because of fatigue, and that he needed to lie down for one to two hours every day. *Id.* The court found that "he can walk five to six blocks if he rests along the way, and he can stand for one hour . . . He experiences a constant dull ache in his back, which worsens after 15 to 20 minutes of sitting . . . His diabetes can make him feel sick, light-headed, and dizzy." *Id.* All of his doctors agreed that he was either permanently disabled or severely limited. *Id.* at 421. The *Embrey* court held "[t]he assumption that Embrey can alternate between sitting and standing for a full eight-hour workday has no support in the record, and indeed is flatly contradicted by Embrey's own testimony and that of [his doctors]." *Id.* at 423. The court emphasized that physicians' subjective judgments are important and their "ultimate conclusions . . . must be given substantial weight." *Id.* at 422.

Similarly, the claimant in *Tackett* had knee problems for more than a decade. 180 F.3d at 1097. His various doctors agreed that he needed to "change positions, shift his body, walk, or stand about every half hour." *Id.* at 1102. Nevertheless, the ALJ determined, in part based on claimant's testimony about taking a long car trip, that he could work an eight hour workday. *Id.* To provide clear and convincing reasons for rejecting an uncontroverted physician's opinion, the ALJ was required to "set out in the record his reasoning and the evidentiary support for his interpretation of the medical evidence." *Id.* at 1102. Because there was no medical evidence to support the ALJ's finding, the court concluded that the ALJ had not properly rejected the uncontradicted medical opinions regarding claimant's need to frequently change positions. *Id.* at 1103. Likewise here, the ALJ points to no medical evidence that demonstrates White can "sit for up to six hours in an eight hour workday," and none of her doctors expressed that opinion. (Tr. at 25.) Rather, both Drs. Barber and Talmage agreed that White needed a sit/stand option. (*Id.* at 229, 238.)

The ALJ's third reason for rejecting Dr. Barber's opinion is that there is no other evidence indicating the need for a sit/stand option. Because "the mere absence of a corroborating opinion cannot in itself constitute a conflict," the ALJ was required to provided clear and convincing reasons for rejecting Dr. Barber's opinion. *Widmark v. Barnhart*, 454

10

F.3d 1063, 1066 (9th Cir. 2006). In *Widmark*, the ALJ rejected a doctor's opinion regarding the plaintiff's thumb impairment in part because "the record contained no other thumb opinion." *Id.* at 1067. However, the *Widmark* court held that this was not a legally adequate reason for rejecting the uncontradicted doctor's opinion because it "merely states a fact and does not explain . . . how that fact leads to the conclusion that [the doctor's] evaluation should be disregarded." *Id.* Similarly here, the statement of fact that no other doctor said White needed the option to sit or stand does not explain why Dr. Barber's medical opinion should not be fully accepted. Thus, it was not a sufficient reason to reject Dr. Barber's sit/stand option. Moreover, Dr. Talmage's report corroborates Dr. Barber and consists of additional evidence demonstrating White's need for a sit/stand option.

Finally, though the ALJ states White claimed she needed to avoid standing and walking as his fourth reason for rejecting the sit/stand option, the Court can find no testimony in the record indicating she must avoid standing or walking. Rather, the evidence regarding White's subjective complaints supports her position that she needs to move around regularly to avoid discomfort. Dr. Talmage recommended White obtain work of a "semi-sedentary" nature, based on the fact that White "specifically indicated that her tolerance for sitting is quite limited and that she is dependent upon the need to get up and walk about on a frequent basis." (Tr. at 229.) Dr. Barber also noted that White's knee was aggravated by "sitting for more than 30 minutes, standing for more than 40 minutes . . . ." (*Id.* at 235.) Finally, even though Dr. Shafer did not examine White's knee, she noted that White indicated an ability to only "sit and stand for about a half hour." (*Id.* at 256.)

Commissioner cites to *Crane* and *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433-34 (9th Cir. 1988), for the proposition that the ALJ properly rejected Dr. Barber's sit/stand option because it was based only on White's subjective complaints and "did not contain any explanation of the bases of [his] conclusions." *Crane*, 76 F.3d at 253. The Commissioner's reliance on these cases is misplaced. In *Crane*, the court rejected medical reports because they were "check-off reports" instead of "individualized medical opinions," not because a narrative report lacked explanation. *Id.* In *Brawner*, the court affirmed the ALJ's

11

rejection of a physician's report based solely on the complaints of a claimant whose misrepresentations and falsification of records undermined his credibility. 839 F.2d at 433-34.

Here, as distinguished from *Brawner*, the ALJ did not question White's credibility regarding her need to move around, nor did he cite it as a reason to reject Dr. Barber's sit/stand option. Moreover, while Dr. Barber listened to White's subjective complaints of pain, he also took note of her long history of knee trouble, including three unsuccessful surgeries. (Tr. at 234.) He observed an "increase in [] symptoms" since his previous report, and noted she was scheduled to see Drs. Goldman and Reynolds to discuss another surgery, possibly a total knee replacement. (*Id.* at 238.) Dr. Barber also watched her walk and saw her limited ability to do a deep-knee bend. (*Id.* at 236.) He examined her MRI and noted an "osteochondral defect" and loss of "medial compartment joint space." (*Id.* at 239.) Based on these clinical findings and observations, he made a professional recommendation that she needed to be able to sit or stand as her symptoms dictated. Thus, Dr. Barber's opinion was not conclusory, brief, or based solely on White's subjective complaints, and should have been accepted in its entirety by the ALJ.

Because the ALJ did not provide clear and convincing reasons for rejecting Dr. Barber's uncontradicted medical opinion, the ALJ erred in ignoring his sit/stand option recommendation.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS White's Motion for Remand and DENIES Commissioner's Cross-Motion for Summary Judgment. This matter is HEREBY REMANDED to the Social Security Administration for reconsideration of White's alleged disability taking Dr. Barber's sit/stand option into account.

**IT IS SO ORDERED.**

Dated: August 17, 2007

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE